# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LEBANON COUNTY EMPLOYEES' RETIREMENT FUND and TEAMSTERS LOCAL 443 HEALTH SERVICES & INSURANCE PLAN, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2019-0527-JTL |
| AMERISOURCEBERGEN CORPORATION, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: October 15, 2019
Date Decided: January 13, 2020

Samuel L. Closic, Eric J. Juray, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Eric L. Zagar, Michael C. Wagner, Christopher M. Windover, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; Frank R. Schirripa, Daniel B. Rehns, Hillary Nappi, HACH ROSE SCHIRRIPA & CHEVERIE LLP, New York, New York; Andrew Blumberg, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; *Attorneys for Plaintiffs*.

Stephen C. Norman, Jennifer C. Wasson, Tyler J. Leavengood, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael D. Blanchard, MORGAN, LEWIS & BOCKIUS LLP, Boston, Massachusetts; *Attorneys for Defendant*.

**LASTER, V.C.**

Defendant AmerisourceBergen Corporation is one of the world's largest wholesale distributors of opioid pain medication. Its role in America's opioid epidemic has made it the target of numerous subpoenas, government investigations, and lawsuits. Two congressional investigations have concluded that AmerisourceBergen failed to identify and address suspicious orders of opioids, contrary to the requirements of federal law. The federal Drug Enforcement Administration (the "DEA") and federal prosecutors in nine states have subpoenaed its documents. It is a defendant in multi-district litigation brought by cities, counties, Indian tribes, union pension funds, and the attorneys general of virtually every state. AmerisourceBergen and the other opioid-distributor defendants have offered to settle with the state attorneys general for $10 billion. Analysts have estimated that resolving all of the litigation would require $100 billion. AmerisourceBergen already has spent more than $1 billion in connection with the opioid-related lawsuits and investigations.

The plaintiffs own stock in AmerisourceBergen. They are investigating whether the firm engaged in wrongdoing in connection with the distribution of opioids. As part of their investigation, the plaintiffs sought to inspect AmerisourceBergen's books and records pursuant to Section 220 of the Delaware General Corporation Law. AmerisourceBergen rejected the plaintiffs' request in its entirety, contending that the plaintiffs lacked a proper purpose, and alternatively, the scope of the requested inspection was overly broad. The plaintiffs filed this action to enforce their statutory inspection rights.

The plaintiffs have proven that they have proper purposes to conduct an inspection, and they have established their right to inspect what this decision refers to as Formal Board

Materials. The record is inadequate to determine whether the plaintiffs can inspect any other materials because AmerisourceBergen refused to provide any discovery into what types of books and records exist, how they are maintained, and who has them. The plaintiffs have leave to take a Rule 30(b)(6) deposition to explore these issues. If the plaintiffs believe that they are entitled to additional books and records after reviewing the Formal Board Materials and taking the Rule 30(b)(6) deposition, then they may make an additional application.

## I.    FACTUAL BACKGROUND

The case was tried on a paper record comprising sixty-five exhibits. The following facts were proven by a preponderance of the evidence.[1]

### A.    AmerisourceBergen's Legal Obligations As An Opioid Distributor

AmerisourceBergen is one of the world's largest distributors of pharmaceutical products, including opioids.[2] In the United States, AmerisourceBergen is one of the three largest distributors of opioids.

As an opioid distributor, AmerisourceBergen must comply with the Comprehensive Drug Abuse Prevention and Control Act of 1970 and its implementing regulations (collectively, the "Controlled Substances Act"). To obtain and maintain a license to

---

[1] Citations in the form "Tr." refer to the trial transcript. Citations in the form "JX — at —" refer to trial exhibits; page citations refer to the last three digits of the control or JX number.

[2] AmerisourceBergen distributes opioids through its wholly owned subsidiary, AmerisourceBergen Distribution Company. *See* JX 40 at '004. For simplicity, this decision refers only to the parent company.

distribute opioids, a distributor must maintain "effective controls against diversion of [opioids] into other than legitimate medical, scientific, research, or industrial channels." 21 U.S.C. § 823(e)(1); *see id.* § 823(b)(1). A distributor must also "design and operate a system to disclose to the registrant suspicious orders of [opioids]." 21 C.F.R. § 1301.74(b). "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Id.*

A distributor must report suspicious orders to the DEA. Once a distributor has reported a suspicious order, it must either (i) decline to ship the order or (ii) ship the order only after conducting due diligence and determining that the order is not likely to be diverted into illegal channels. *See Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206, 212–13 (D.C. Cir. 2017). The DEA can suspend or revoke the license of any distributor that fails to maintain controls or respond appropriately to suspicious orders. *See* 21 U.S.C. § 824.

**B.      The Opioid Epidemic And Rogue Pharmacies**

The United States remains mired in an opioid epidemic that has killed hundreds of thousands of Americans and affected the lives of millions more. Starting in the late 1990s, pharmaceutical companies reassured doctors that patients would not become addicted to opioids. JX 43 at '001. Doctors responded by writing more prescriptions for opioids, often without appreciating or advising patients about the risk of addiction. *See* JX 24. Between 1999 and 2014, the number of opioid prescriptions quadrupled. JX 22 at '003. As many as 29% of the patients who were prescribed opioids for chronic pain misused them, and as many as 12% developed an opioid-use disorder. JX 43 at '001.

3

In a vicious cycle, increasing levels of opioid abuse led to greater demand for opioids. So-called "rogue pharmacies" met the demand by filling large numbers of prescriptions. Stopping rogue pharmacies became a DEA priority.

## C.   AmerisourceBergen And Rogue Pharmacies

In 2005, DEA personnel met with the Director of Regulatory Affairs at AmerisourceBergen to make sure that the company understood the common characteristics of rogue pharmacies and its obligation to prevent the diversion of controlled substances. JX 3 at '002–03. In April 2007, the DEA suspended AmerisourceBergen's license for its distribution center in Orlando, Florida, because of its involvement with rogue pharmacies. *See id.* at '001. The DEA found that the Orlando center had "sold over 5.2 million dosage units of [opioids] to pharmacies" and that AmerisourceBergen "knew, or should have known" that the pharmacies "were diverting controlled substances into other than legitimate medical, scientific and industrial channels." *Id.* at '003. Among other things, the DEA found that the pharmacies in question (i) ordered opioids from AmerisourceBergen "in amounts that far exceeded what an average pharmacy orders," (ii) "ordered small amounts of other drug products relative to the pharmacies' [opioids] purchases," (iii) "ordered [opioids] much more frequently than [AmerisourceBergen]'s other pharmacy customers," and (iv) were publicly known to "fill[] prescriptions that were issued by physicians acting outside the usual course of professional practice . . . ." *Id.* at '002. The DEA concluded that AmerisourceBergen had "failed to maintain effective controls against diversion." *Id.* at '003.

4

In June 2007, AmerisourceBergen settled with the DEA and committed to adopt and maintain "a compliance program designed to detect and prevent diversion of controlled substances." JX 5 art. II § 1(a) (the "2007 Settlement"). The program applied to all of AmerisourceBergen's facilities and required "more rapid identification and daily reporting of orders that may indicate diversion of controlled substances." JX 6 at '001. It also required "a more rigorous examination process" for new customers. *Id.*

Later in 2007, AmerisourceBergen resolved similar problems at Bellco Drug Company ("Bellco"), a distributor that AmerisourceBergen acquired in March 2007. *See* JX 2. Between signing and closing, Bellco entered into a consent decree with the DEA "for failing to report suspicious orders of controlled substances to . . . pharmacies." JX 8; *see* JX 7. Bellco paid an $800,000 fine and surrendered its DEA license. *See* JX 7; JX 8.

**D.      AmerisourceBergen's Monitoring And Compliance Program**

After these events, AmerisourceBergen implemented a new compliance program that was developed in consultation with the DEA in an effort to establish an industry standard. *See* Dkt. 20 at 12–13; JX 6; JX 9. After AmerisourceBergen implemented the program, its Vice President of Corporate Security and Regulatory Affairs gave a presentation at a conference hosted by the DEA that addressed when companies should report suspicious orders to authorities. Dkt. 20 at 13. In August 2015, AmerisourceBergen updated its compliance program again. JX 41 at '185.

According to AmerisourceBergen's public filings, the company's senior officers and its board of directors (the "Board") play a significant role in monitoring and enforcing compliance. For example, AmerisourceBergen's proxy statement for its annual meeting in

2011 stated, "Our Chief Compliance Officer and/or Senior Vice President, General Counsel and Secretary report to the Audit Committee throughout the year on the status of our compliance program . . . and any changes or developments." JX 16 at '021. Eight years later, AmerisourceBergen continued to make similar disclosures; its proxy statement for its annual meeting in 2019 stated: "Our Board oversees risk management and considers specific risk topics on an ongoing basis, including risks associated with the Company's distribution of opioid medications. . . . Our Board of Directors actively oversees and reviews the effectiveness of our compliance programs, including our diversion control program." JX 44 at '014–15. The charter of the Audit Committee corroborates these statements by requiring that the committee review "at least quarterly reports received from the Company's Chief Compliance Officer, counsel and other members of management regarding the Company's compliance with applicable legal requirements, including requirements of the Drug Enforcement Administration." JX 49 at '005.

## E. Government Investigations, Lawsuits, And Multidistrict Litigation

Since 2012, AmerisourceBergen has received subpoenas relating to its anti-diversion and order-monitoring programs from the DEA and from U.S. Attorneys' Offices for the District of New Jersey, the District of Kansas, the Northern District of Ohio, the Eastern District of New York, the District of Colorado, the Northern District of West Virginia, the Western District of Michigan, the Middle District of Florida, the Southern District of Florida, and the Eastern District of California. JX 21 at '074–75; JX 46 at '014.

In 2012, the Attorney General for the State of West Virginia sued AmerisourceBergen and other opioid distributors, alleging that they had failed to

6

implement effective controls to identify suspicious orders and guard against the diversion of opioids. JX 21 at '075. In 2017, AmerisourceBergen paid $16 million to settle the litigation. JX 27 at '002. Also during 2017, a consortium of attorneys general from forty-one states requested documents and information from AmerisourceBergen and other opioid distributors as part of an investigation into their distribution practices. JX 29.

In 2018, the Energy and Commerce Committee of the United States House of Representatives released a report titled "Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia." JX 41 (the "West Virginia Report"). The report found that AmerisourceBergen and the two other largest wholesale opioid distributors in the United States "failed to address suspicious order monitoring" in West Virginia. *Id.* at '008. It concluded that after the 2007 Settlement with the DEA, AmerisourceBergen initially had identified and halted suspicious orders from West Virginia. But during the years following 2013, AmerisourceBergen's reporting of suspicious orders declined significantly, eventually reaching nominal levels. In 2013, AmerisourceBergen shipped 20.2 million doses of opioids to West Virginia and reported 792 suspicious orders. *Id.* at '253. Two years later, in 2015, AmerisourceBergen shipped 15.85 million doses to West Virginia, yet reported only fifty-three suspicious orders. *Id.* In 2016, AmerisourceBergen's reporting of suspicious orders became virtually non-existent: it shipped 11.5 million doses to West Virginia, yet reported only three suspicious orders. *Id.* And similarly in 2017, AmerisourceBergen reported only five suspicious orders. *Id.* at '252–53. The West Virginia Report inferred that the trend for AmerisourceBergen's reporting of suspicious orders in West Virginia reflected a broader nationwide decline,

because "in 2017, on a per-capita basis, West Virginia had the second highest number of suspicious orders reported to the DEA by AmerisourceBergen of all states." *Id.* at '252.

The West Virginia Report also documented changes in how AmerisourceBergen responded to pharmacies that placed suspicious orders. In 2009, after a pharmacy submitted thirty-six suspicious orders in a single month, AmerisourceBergen terminated its relationship with the pharmacy. *Id.* at '253. But between 2013 and 2014, when a pharmacy submitted 109 suspicious orders over a period of five months, AmerisourceBergen continued doing business with the pharmacy. *Id.* at '254.

Also in 2018, the Office of the Ranking Member for the Homeland Security and Governmental Affairs Committee in the United States Senate released a report titled "Fueling an Epidemic, Report Three: A Flood of 1.6 Billion Doses of Opioids into Missouri and the Need for Stronger DEA Enforcement." *See* JX 38 (the "Missouri Report"). The Missouri Report similarly concluded that AmerisourceBergen and the two other largest wholesale opioid distributors had "consistently failed to meet their reporting obligations" regarding suspicious orders. *Id.* at '002. And AmerisourceBergen reported suspicious orders far less frequently than its competitors, even when shipping roughly the same quantities of opioids. For example, between 2012 and 2017, AmerisourceBergen and McKesson each shipped around 650 million doses to Missouri; McKesson reported 16,714 suspicious orders while AmerisourceBergen reported only 224. *Id.* at '009.

In 2019, the New York Attorney General filed an amended complaint against AmerisourceBergen and other opioid distributors and manufacturers. JX 48 (the "NYAG Complaint"). In allegations specifically targeting AmerisourceBergen, the NYAG

8

Complaint contended that AmerisourceBergen's policies facilitated the diversion of opioids and that AmerisourceBergen failed to stop it from happening. *See id.* ¶¶ 698–735. The NYAG Complaint also contended that AmerisourceBergen "has consistently stood out as compared to its major competitors [because of] its unwillingness to identify suspicious orders, even among customers that regularly exceeded their thresholds and presented multiple red flags of diversion." *Id.* ¶ 727.

Among other things, the NYAG Complaint alleged that AmerisourceBergen lacked "an internal rule or policy that requires investigation of a customer based on a specific number of suspicious order reports." *Id.* ¶ 723. The NYAG Complaint also alleged that AmerisourceBergen set arbitrary limits on the number of suspicious orders it held for review, which resulted in other suspicious orders being shipped. *Id.* ¶¶ 701, 705. The NYAG Complaint similarly alleged that AmerisourceBergen only reported some of its suspicious orders to the DEA. *Id.* ¶¶ 705, 722, 728. The NYAG Complaint further alleged that AmerisourceBergen's procedures failed to ensure that accounts for blocked or terminated customers were deactivated, which enabled pharmacies on the "Do Not Ship List" to continue ordering and receiving opioids. *Id.* ¶ 726. When the control deficiency was discovered, AmerisourceBergen reinstated the affected customers without conducting any additional due diligence review. *Id.*

The NYAG Complaint supported these allegations by analyzing publicly available data on AmerisourceBergen's pharmacy customers and by providing examples of rogue pharmacies that AmerisourceBergen supplied. The examples included:

9

- A pharmacy in Orange County, New York, that consistently ranked at or above the 99th percentile in the state for both its number of opioid orders and its total opioids ordered by weight. Between 2014 and 2016, more than 10% of its prescriptions were written by prescribers who were later indicted or convicted of opioid-related charges. Over the same period, the number of suspicious orders that AmerisourceBergen reported from the pharmacy declined. In 2018, AmerisourceBergen was still the pharmacy's primary opioid distributor. *See id.* at '208.

- A pharmacy in Bronx County, New York, that ranked above the 95th percentile for five years straight (2012 to 2016) based on percentage of opioids volume shipped. On average, 58% of its opioid prescriptions were paid in cash, putting it in the 99th percentile for the state. From 2013 to 2015, approximately half of its opioid prescriptions were written by prescribers who were later convicted. In 2018, this pharmacy was still a customer of AmerisourceBergen's. *See id.* at '210.

- A pharmacy in Queens County, New York, where, between 2013 and 2017, 77% of its prescriptions were written by prescribers who were later indicted or convicted. AmerisourceBergen did not stop shipping to that pharmacy until 2017. *See id.* at '209.

AmerisourceBergen is also a defendant in multidistrict litigation pending in the United States District Court for the Northern District of Ohio (the "Multidistrict Litigation"). That action centralizes 1,548 different lawsuits brought by state attorneys general, cities, counties, Native American tribes, union benefit funds, and other plaintiffs. *See* JX 45.

One of the centralized lawsuits illustrates the types of cases that are proceeding through the Multidistrict Litigation. In a detailed complaint containing some 1,165 paragraphs, the State of Ohio and the County of Cuyahoga County alleged that AmerisourceBergen and other distributors failed to report or halt suspicious orders of opioids. *See* JX 37 (the "Ohio Complaint") ¶¶ 9, 14. The Ohio Complaint further alleged that AmerisourceBergen and other manufacturers collaborated to increase DEA-imposed

10

limits on the volume of opioids that could be manufactured and distributed. *Id.* ¶ 517. It also alleged that opioid distributors collaborated to increase opioid sales by working through organizations such as the Pain Care Forum and the Healthcare Distribution Alliance. *Id.* ¶¶ 500–14.

The claims in the Multidistrict Litigation survived a motion to dismiss (except for certain public nuisance claims). *See* JX 42. The claims also survived a defense motion for summary judgment. *See* JX 54 at '016. In response to the defendants' motion for summary judgment, the plaintiffs presented evidence indicating that despite having a compliance program in place nominally, "AmerisourceBergen continued the practice of shipping some orders it identified as suspicious, with little or no documentation as to whether a due diligence investigation was conducted." JX 52 at '105. They also presented evidence indicating that "other due diligence policies put in place . . . suffered from numerous and critical deficiencies" that "rendered AmerisourceBergen's due diligence program ineffective and toothless." *Id.* As an example, the plaintiffs described a project that AmerisourceBergen had implemented in 2016 to ensure that it had the necessary documentation to establish that all of its customers were authorized to purchase controlled substances. The project identified a significant number of customer files that lacked the necessary documentation. One year later, AmerisourceBergen had collected the necessary documentation for only about 10% of the files. *Id.* at '106.

The Multidistrict Litigation is heading toward a series of bellwether trials. JX 47. In August 2019, AmerisourceBergen and two other opioid distributors offered to pay $10 billion to settle the claims asserted by state attorneys general. JX 55. The regulators

countered at $45 billion. *See id.* Analysts have estimated that a global settlement could cost as much as $100 billion. *Id.*

Meanwhile, AmerisourceBergen continues to incur costs. Since September 2017, AmerisourceBergen has spent more than $1 billion on litigation and opioid-related costs, including settlements and legal fees relating to opioid lawsuits and investigations. *See* AmerisourceBergen Corp., Annual Report (Form 10-K) 73 (Sept. 30, 2019).

## F.      The Section 220 Demand

On May 21, 2019, the plaintiffs served a demand for books and records on AmerisourceBergen. *See* JX 50 (the "Demand"). The Demand stated that the plaintiffs sought to "investigate whether the Company's Directors and Officers have committed mismanagement or breached their fiduciary duties" in connection with the distribution of opioids. *See id.* at '013. The Demand described the opioid crisis and AmerisourceBergen's anti-diversion and compliance practices. *See id.* at '002–10. The Demand asked for "Board Materials" relating to ten categories of information. *Id.* at '011–12. The specific requests appear and are addressed in the Legal Analysis. *See infra* Part II.B.

On June 7, 2019, AmerisourceBergen rejected the Demand in its entirety, contending that the Demand did not "state a proper purpose or a credible basis to suspect wrongdoing" and that the scope of the inspection was "overly broad." *See* JX 51 at '006. To date, AmerisourceBergen has not produced any documents in response to the Demand.

On July 8, 2019, the plaintiffs filed this action. The parties negotiated a schedule and conducted limited discovery. A trial on a paper record took place on October 15, 2019.

12

## II. LEGAL ANALYSIS

Section 220(b) of the Delaware General Corporation Law grants "[a]ny stockholder" the right "to inspect for any proper purpose . . . [t]he corporation's stock ledger, a list of its stockholders, and its other books and records . . . ." 8 *Del. C.* § 220(b). "Section 220 is now recognized as 'an important part of the corporate governance landscape.'" *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 120 (Del. 2006) (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 571 (Del. 1997)).

To obtain books and records under Section 220(b), the plaintiff must establish by a preponderance of the evidence (i) its status as a stockholder, (ii) compliance with the statutory requirements for making a demand, and (iii) a proper purpose for conducting the inspection. *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 144 (Del. 2012). After meeting these requirements, the plaintiff must demonstrate by a preponderance of the evidence that "each category of books and records is essential to accomplishment of the stockholder's articulated purpose for the inspection." *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996). The only disputed issues in this case are whether the plaintiffs have a proper purpose and the scope of the inspection.

### A. The Plaintiffs' Purposes

"The paramount factor in determining whether a stockholder is entitled to inspection of corporate books and records is the propriety of the stockholder's purpose in seeking such inspection." *CM & M Gp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982). In the language of the statute, "[a] proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder." 8 *Del. C.* § 220(b).

13

"There is no shortage of proper purposes under Delaware law . . . ." *Melzer v. CNET Networks, Inc.*, 934 A.2d 912, 917 (Del. Ch. 2007). Prior cases have recognized that a stockholder can state a proper purpose by seeking

- to investigate allegedly improper transactions or mismanagement;

- to clarify an unexplained discrepancy in the corporation's financial statements regarding assets;

- to investigate the possibility of an improper transfer of assets out of the corporation;

- to ascertain the value of his stock;

- to aid litigation he has instituted and to contact other stockholders regarding litigation and invite their association with him in the case;

- "[t]o inform fellow shareholders of one's view concerning the wisdom or fairness, from the point of view of the shareholders, of a proposed recapitalization and to encourage fellow shareholders to seek appraisal";

- "to discuss corporate finances and management's inadequacies, and then, depending on the responses, determine stockholder sentiment for either a change in management or a sale pursuant to a tender offer";

- to inquire into the independence, good faith, and due care of a special committee formed to consider a demand to institute derivative litigation;

- to communicate with other stockholders regarding a tender offer;

- to communicate with other stockholders in order to effectuate changes in management policies;

- to investigate the stockholder's possible entitlement to oversubscription privileges in connection with a rights offering;

- to determine an individual's suitability to serve as a director;

- to obtain names and addresses of stockholders for a contemplated proxy solicitation; or

- to obtain particularized facts needed to adequately allege demand futility after the corporation has admitted engaging in backdating stock options.

14

*City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 1 A.3d 281, 289 n.30 (Del. 2010) (emphasis omitted, formatting altered to add bullets, and internal footnotes omitted) (quoting Edward P. Welch et al., *Folk on the Delaware General Corporation Law, Fundamentals* § 220.6.3, at GCL-VII-202 to -206 (2009 ed.)).

The Demand identifies the following purposes for inspection:

> (i)    to investigate possible breaches of fiduciary duty, mismanagement, and other violations of law by members of the Company's Board of Directors and management, including the Company's senior officers . . . in connection with [AmerisourceBergen]'s distribution of prescription opioid medications;
>
> (ii)    to consider any remedies to be sought in respect of the aforementioned conduct;
>
> (iii)    to evaluate the independence and disinterestedness of the members of the Board; and
>
> (iv)    to use information obtained through inspection of the Company's books and records to evaluate possible litigation or other corrective measures with respect to some or all of these matters.

JX 50 at '012–13.

The second and fourth purposes are best read as elaborating on the first and third purposes. Through the second and fourth purposes, the plaintiffs signaled that they are not solely interested in filing a derivative lawsuit to pursue a damages remedy. They are open to considering other possible remedies, corrective measures, and methods of addressing the wrongdoing that they believe has occurred. They seek books and records to inform themselves and to identify and evaluate their alternatives. This decision therefore analyzes the first and third purposes, while taking the second and fourth purposes into account when considering the scope of the first and third purposes.

15

## 1. Investigating Wrongdoing Or Mismanagement

The parties devoted the bulk of their efforts to debating the plaintiffs' first purpose: "to investigate possible breaches of fiduciary duty, mismanagement, and other violations of law by members of the Company's Board of Directors and management, including the Company's senior officers . . . in connection with [AmerisourceBergen]'s distribution of prescription opioid medications." JX 50 at '012. The plaintiffs have made the showing necessary to establish this purpose.

"It is well established that a stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.'" *Seinfeld*, 909 A.2d at 121.

> One of the most traditional proper purposes for a § 220 demand is the investigation of possible wrongdoing by management. When a stockholder has made a colorable showing of potential wrongdoing, inspecting the company's books and records can help the stockholder to ferret out whether that wrongdoing is real and then possibly file a lawsuit if appropriate.

*KT4 P'rs v. Palantir Techs. Inc.*, 203 A.3d 738, 758 (Del. 2019).

To protect the corporation from "indiscriminate fishing expeditions" and from demands grounded in nothing more than curiosity, "[a] mere statement of a purpose to investigate possible general mismanagement, without more, will not entitle a shareholder to broad § 220 inspection relief." *Seinfeld*, 909 A.2d at 122 (internal quotation marks omitted). To obtain books and records, a stockholder must "show, by a preponderance of the evidence, a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation . . . ." *Id.* at 123.

"Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to

16

it, has the more convincing force and makes you believe that something is more likely true than not." *Agilent Techs, Inc. v. Kirkland*, 2010 WL 610725, at \*13 (Del. Ch. Feb. 18, 2010) (internal quotation marks omitted). "Under this standard, [the plaintiff] is not required to prove its claims by clear and convincing evidence or to exacting certainty. Rather, [the plaintiff] must prove only that it is more likely than not that it is entitled to relief." *Triton Const. Co. v. E. Shore Elec. Servs.*, 2009 WL 1387115, at \*6 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) (TABLE).

The stockholder need only establish by a preponderance of the evidence that there is a credible basis from which the court can infer a possibility of wrongdoing. "A stockholder is not required to prove by a preponderance of the evidence that [wrongdoing] and mismanagement are actually occurring."[3] A stockholder is also not required to show by a preponderance of the evidence that wrongdoing is probable.

The "credible basis" standard is "the lowest possible burden of proof." *Seinfeld*, 909 A.2d at 123. A plaintiff may meet it by making "a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing." *Id.*; *accord Sec. First*, 687 A.2d at 568. The plaintiff may rely on circumstantial evidence. *Wal-Mart*

---

[3] *Seinfeld*, 909 A.2d at 123 (internal quotation marks omitted); *accord Axcelis*, 1 A.3d at 286–87 ("Such evidence need not prove that wrongdoing, in fact, occurred."); *Sec. First*, 687 A.2d at 565 ("The stockholder need not actually prove the wrongdoing itself by a preponderance of the evidence."); *id.* at 567 ("The actual wrongdoing itself need not be proved in a Section 220 proceeding, however."); *Thomas & Betts*, 681 A.2d at 1031 ("[Stockholders] are not required to prove by a preponderance of the evidence that waste and [mis]management are actually occurring.").

*Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1273 (Del. 2014). The plaintiff also may rely on hearsay, as long as it is sufficiently reliable.[4]

To evaluate whether a stockholder has met the *Seinfeld* test, the trial court must make a judgment grounded in the facts of a particular case. A stockholder cannot obtain books and records simply because the stockholder disagrees with a board decision, even if the decision turned out poorly in hindsight. A stockholder also cannot obtain books and records to investigate a trivial concern or to satisfy "[m]ere curiosity." *Sec. First*, 687 A.2d at 568. By contrast, when there is a credible basis to suspect that a corporation has been violating positive law or failing to comply with the applicable regulations, and when those potential violations appear to have contributed to a corporate trauma, it is likely that some level of investigation will be warranted. *See id.* at 571 ("Stockholders have a right to at least a limited inquiry into books and records when they have established some credible basis to believe that there has been wrongdoing."); *In re Facebook, Inc. Section 220 Litig.* (*Facebook 220*), 2019 WL 2320842, at *14–15 (Del. Ch. May 30, 2019, revised May 31, 2019) (explaining that Delaware permits stockholders to investigate instances of "corporate disobedience").

---

[4] *See Thomas & Betts*, 681 A.2d at 1032–33; *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *4 (Del. Ch. Apr. 28, 2004); *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 208–13 (Del. Ch. 1976).

### a. The Plaintiffs' Showing Of Possible Corporate Wrongdoing

The plaintiffs have shown by a preponderance of the evidence that there is a credible basis to infer that AmerisourceBergen possibly violated the Controlled Substances Act. The evidence of possible wrongdoing is circumstantial, and it does not establish that wrongdoing occurred. What the evidence establishes is a credible basis to infer possible wrongdoing warranting further investigation.

Ongoing investigations and lawsuits can provide the necessary evidentiary basis to suspect wrongdoing or mismanagement warranting further investigation.[5] This type of evidence is stronger when governmental agencies or arms of law enforcement have conducted the investigations or pursued the lawsuits.[6]

---

[5] *See In re UnitedHealth Gp., Inc. Section 220 Litig.*, 2018 WL 1110849, at *7 (Del. Ch. Feb. 28, 2018); *In re Plains All Am. Pipeline, L.P.*, 2017 WL 6016570, at *3–4 (Del. Ch. Aug. 8, 2017); *Elow v. Express Scripts Hldg. Co.*, 2017 WL 2352151, at *5–6 (Del. Ch. May 31, 2017), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019); *Cohen v. El Paso Corp.*, 2004 WL 2340046, at *2 (Del. Ch. Oct. 18, 2004); *Freund v. Lucent Techs., Inc.*, 2003 WL 139766, at *3 (Del. Ch. Jan. 9, 2003); *Saito v. McKesson HBOC, Inc.*, 2001 WL 818173, at *4 (Del. Ch. July 10, 2001), *aff'd in pertinent part, rev'd on other grounds*, 806 A.2d 113 (Del. 2002); *Carapico v. Phila. Stock Exch., Inc.*, 791 A.2d 787, 792 (Del. Ch. 2000); *see also Facebook 220*, 2019 WL 2320842, at *15–16 (finding that regulatory investigations and lawsuits based on the same misconduct underlying plaintiffs' Section 220 demand supported the plaintiffs' credible basis to infer wrongdoing).

[6] *See Plains*, 2017 WL 6016570, at *3–4 (finding a credible basis to suspect wrongdoing warranting further investigation based on the indictment of the corporation in connection with the alleged misconduct); *Cohen*, 2004 WL 2340046, at *2 (finding a credible basis to suspect wrongdoing based on (i) the corporation's announcement of a write-down as a result of improper accounting and (ii) the SEC's formal investigation into the corporation's accounting practices); *Freund*, 2003 WL 139766, at *3 (finding a credible basis to suspect wrongdoing based on (i) the corporation's revisions of its past financial

19

In this case, the flood of government investigations and lawsuits relating to AmerisourceBergen's opioid-distribution practices is sufficient to establish a credible basis to suspect wrongdoing warranting further investigation. As described in the Factual Background, numerous governmental actors have conducted investigations into or filed lawsuits based on AmerisourceBergen's opioid-distribution practices. These include an action brought by the West Virginia Attorney General that AmerisourceBergen paid $16 million to settle. They also include a pending action in which the New York Attorney General contends that AmerisourceBergen "has consistently stood out as compared to its major competitors [because of] its unwillingness to identify suspicious orders, even among customers that regularly exceeded their thresholds and presented multiple red flags of diversion." JX 48 ¶ 727. AmerisourceBergen is also a defendant in the Multidistrict Litigation, where the plaintiffs assert that AmerisourceBergen and other opioid distributors failed to report or halt suspicious orders and instead collaborated to undercut the DEA's volume-based limits on opioid distribution. JX 37 ¶¶ 795–99.

The West Virginia Report and the Missouri Report similarly identified potential wrongdoing by AmerisourceBergen. The West Virginia Report concluded that

---

statements; (ii) the SEC's formal investigation into the corporation's accounting practices; and (iii) a series of lawsuits brought by other stockholders, which raised allegations of "securities fraud, mismanagement and a retaliatory firing of an employee for 'whistle blowing'"); *Saito*, 2001 WL 818173, at *4 (finding a credible basis to suspect wrongdoing based on (i) the corporation's restatement of financial statements, (ii) the public admission of the irregularities, (iii) the termination of high-ranking executives, and (iv) the institution of criminal proceedings by federal authorities).

20

AmerisourceBergen had "consistently failed to meet [its] reporting obligations" regarding suspicious orders. JX 38 at '002. The Missouri Report concluded that AmerisourceBergen had "failed to address suspicious order monitoring." JX 41 at '008. Both reports found that AmerisourceBergen's failures to report suspicious orders contributed to the opioid epidemic in those states.

AmerisourceBergen argues that these sources fail to establish a credible basis to suspect wrongdoing because the investigations and litigation were "directed at the entire pharmaceutical industry." Dkt. 20 at 17; *see id.* at 39. That may be true, but the argument that "everyone else is doing it" is rarely a persuasive response. *See In re Massey Energy Co.,* 2011 WL 2176479, at *20–21 (Del. Ch. May 31, 2011) ("Telling your parents that all the kids are getting caught shoplifting, cheating, or imbibing illegal substances is not, fortunately, a good excuse."). As scholars have documented, bad practices often spread within industries due to network effects, with stock-option backdating providing a salient example.[7] Regardless, the government reports and various complaints include detailed

---

[7] Todd Haugh, *The Power Few of Corporate Compliance*, 53 Ga. L. Rev. 129, 162–70, 180 n.75 (2018) (describing the role of network effects in normalizing criminal behavior and corporate compliance violations); Bert I. Huang, Essay, *Shallow Signals*, 126 Harv. L. Rev. 2227, 2242 & nn.39–40 (2013) (describing a "contagion" aspect of the widespread options backdating scandal of the 2000s); *see also* John M. Bizjak, et al., *Option Backdating and Board Interlocks*, 22 Rev. Fin. Stud. 4821 (2006) (exploring the role that board interlocks play in explaining the spread of option backdating to a large number of firms across industries). *See generally* Sarath Sanga, *Network Effects in Corporate Governance*, --- J.L. & Econ. --- (forthcoming), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3086245 (concluding that network effects dominate secular trends in corporate governance).

information about AmerisourceBergen's misconduct.[8] The NYAG Complaint even explains how AmerisourceBergen's misconduct differed from and was more serious than other defendants' misconduct. *See* JX 48 ¶ 727. The fact that AmerisourceBergen is one among many manufacturers and distributors that have been investigated or named as defendants, standing alone, does not mitigate the evidentiary value of the government investigations and complaints.

The plaintiffs have not approached AmerisourceBergen as part of an indiscriminate fishing expedition or out of mere curiosity. AmerisourceBergen is suffering a significant corporate trauma, as evidenced by its recent offer (along with the two other largest opioid distributors) to pay $10 billion to settle with the state attorneys general who are pursuing claims in the Multidistrict Litigation. The state attorneys general rejected the offer and demanded $45 billion. And any settlement with the state attorneys general would not resolve the other claims in the Multidistrict Litigation and elsewhere. Analysts have estimated that a global settlement could cost as much as $100 million.

The opioid crisis is a matter of national significance. There is a credible basis to suspect that AmerisourceBergen's situation did not result from an ordinary business

---

[8] *Compare Carapico*, 791 A.2d at 792 ("[The plaintiffs'] purposes of investigating corporate mismanagement and waste met the threshold of specificity. . . . The SEC Orders contain detailed information reflecting possible corporate mismanagement"), *with La. Mun. Police Empls.' Ret. Sys. v. Lennar Corp.*, 2012 WL 4760881, at *4 (Del. Ch. Oct. 5, 2012) ("Instead, the articles merely report that [the defendant corporation] is one of many companies in many industries caught up in the dragnet of a federal investigation. Such evidence does not support an inference of possible wrongdoing.").

decision that, in hindsight, simply turned out poorly. AmerisourceBergen operates in a highly regulated industry and must comply with the Controlled Substances Act. There is strong circumstantial evidence that AmerisourceBergen may have ignored indications of suspicious orders, failed to halt and investigate suspicious orders, and failed to report suspicious orders to the DEA. There is strong circumstantial evidence that AmerisourceBergen may have ignored indications that it was distributing opioids to rogue pharmacies and that it chose to continue doing business with these pharmacies rather than cutting them off. There is strong circumstantial evidence that through these and other activities, AmerisourceBergen may have pushed opioids into the distribution chain under circumstances where AmerisourceBergen knew or should have known that they would be diverted for improper uses.

Whether a corporation has engaged in this type of wrongdoing is a legitimate matter of concern that is reasonably related to the plaintiffs' interests as stockholders. When a corporation has suffered a significant trauma, and when a stockholder can establish a credible basis to suspect a possible violation of positive law, the stockholder has stated a proper purpose for an inspection of books and records. *See Facebook 220*, 2019 WL 2320842, at *15. Having made this showing, the plaintiffs are entitled to explore whether AmerisourceBergen has violated positive law. The plaintiffs are also entitled to explore whether the AmerisourceBergen's fiduciaries—its directors and senior officers—were involved in the violation, condoned it, consciously ignored indications that it was going on, or consciously failed to establish and monitor the necessary information and reporting

23

systems that would have enabled them to identify and address the violations of positive law.

### b. AmerisourceBergen's They-Only-Want-To-Sue Argument

To lay the cornerstone for its defenses, AmerisourceBergen contends that the plaintiffs' purposes as expressed in the Demand are "confined to investigating a *Caremark* claim . . . with the sole objective of bringing litigation." Dkt. 20 at 2. This characterization enables AmerisourceBergen to defend the Section 220 action by launching merits-based strikes on the lawsuit that AmerisourceBergen expects the plaintiffs to file someday.

To support its reading of the Demand, AmerisourceBergen maintains that if a stockholder wants to investigate corporate wrongdoing and use the resulting documents to achieve an end other than filing litigation, then the stockholder must say so in the demand. *See* Dkt. 20 at 27. That position runs contrary to Delaware Supreme Court precedent. The high court has held that a stockholder who generally sought to investigate corporate wrongdoing could use the fruits of the investigation to file a lawsuit or for other purposes, such as to "seek an audience with the board to discuss proposed reforms, or failing in that, [to] prepare a stockholder resolution for the next annual meeting, or [to] mount a proxy fight to elect new directors." *Saito*, 806 A.2d at 117; *see Seinfeld*, 909 A.2d at 121 (identifying possible uses other than litigation for books and records resulting from an investigation of corporate wrongdoing); *White v. Panic*, 783 A.2d 543, 557 n.54 (Del. 2001) (same).

AmerisourceBergen's approach would require a stockholder to commit in advance to what it will do with an investigation before seeing the results of the investigation. An

investigator who proclaimed the outcome of an investigation at the outset would be viewed as biased. *See, e.g.*, *Biondi v. Scrushy*, 820 A.2d 1148, 1165 (Del. Ch. 2003) (denying motion to stay by special litigation committee when chairman announced that the individual subject to investigation had been vindicated, even though the SLC's investigation was just getting under way), *aff'd sub nom. In re HealthSouth Corp. S'holders Litig.*, 847 A.2d 1121 (Del. 2004) (TABLE). We would not want a prosecutor to commit to bringing charges before learning whether the evidence supported them. A responsible stockholder cannot identify all of the potential uses for books and records before knowing what the books and records reveal.[9]

There is a line of authority in which this court has required stockholders who wanted to investigate mismanagement to state up-front what they planned to do with the fruits of the inspection. In the language of the original decision, a stockholder must not only state a proper purpose, but also "must state a reason for the purpose, i.e., what it will do with the

---

[9] *See KT4 P'rs v. Palantir Techs., Inc.*, 2018 WL 1023155, at *11 (Del. Ch. Feb. 22, 2018) (refusing to hold that stockholder lacked a proper purpose to investigate wrongdoing where it had not committed to commencing litigation; observing that "[i]n one sense, [plaintiff] could be commended for not committing to launch litigation against [the company] before it sees the documents it has requested"), *aff'd in pertinent part, rev'd on other grounds*, 203 A.3d 738 (Del. 2019); *Elow*, 2017 WL 2352151, at *6 n.73 (observing that a stockholder cannot know "prior to an inspection whether he or she definitively will pursue litigation no matter what the documents revealed"); *see also Norfolk Cty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *11 (Del. Ch. Feb. 12, 2009) (denying motion for summary judgment; holding that a statement that the stockholder intended to investigate corporate wrongdoing for purposes of possibly filing a derivative suit and "[t]o take appropriate action in the event the members of the [board] did not properly discharge their fiduciary duties" was sufficient to support "an additional purpose of determining whether to take any other action [besides litigation] based on the suspected wrongdoing").

25

information, or an end to which that investigation may lead." *W. Coast Mgmt. & Capital, LLC v. Carrier Access Corp.*, 914 A.2d 636, 646 (Del. Ch. 2006).

The two earliest cases to apply the purpose-plus-an-end test did so in limited circumstances where the context supported a finding that the stockholder only sought information for purposes of pursuing litigation. The first case involved a stockholder who had previously filed a derivative action and had its claim dismissed without prejudice for failing to plead demand futility. The stockholder then requested books and records to plead a better complaint. *See W. Coast*, 914 A.2d at 638–39. The court held that the stockholder was estopped from taking a second bite at the demand-futility apple, held that the stockholder had no other end in mind for using the books and records, and ruled that the stockholder had not identified a permissible reason for conducting the inspection. *Id.* at 645–46. The court distinguished this situation from a case "where there is a 'credible showing' of 'legitimate issues of wrongdoing,' and the plaintiff is investigating to determine the nature of the wrongdoing and what further actions may be appropriate based on that information." *Id.* at 646 n.42 (quoting *Sec. First*, 687 A.2d at 568).

The second case to apply the purpose-plus-an-end test involved a stockholder who had filed a federal securities action, but who could not seek discovery in that action because of the automatic stay imposed by the Private Securities Litigation Reform Act. The court held on the facts presented that the stockholder had no other end in mind other than to bypass the automatic stay and ruled that the stockholder had not identified a permissible reason for the inspection. *See Beiser v. PMC-Sierra, Inc.*, 2009 WL 483321, at *3 (Del. Ch. Feb. 26, 2009).

26

Both of these cases involved fact-specific contexts that supported rulings that the stockholders were only seeking books and records to pursue litigation. In drawing these conclusions, the decisions considered that the stockholders had not identified any other ends in their demands. Recently, however, this court has framed the purpose-plus-an-end test as a general requirement under Section 220.[10] Some decisions have mentioned the concept in passing,[11] but others have applied it to hold that a stockholder who fails to cite ends other than litigation when making a demand cannot use the fruits of the investigation for any purpose other than litigation.[12] These cases turn the purpose-plus-an-end concept into a requirement that goes beyond what Section 220 and Delaware Supreme Court precedent require.

---

[10] *See, e.g.*, *S.E. Pa. Transp. Auth. v. Facebook, Inc.* (*Facebook Compensation 220*), 2019 WL 5579488, at *10 n.119 (Del. Oct. 29, 2019) (citing *Beiser*, 2009 WL 483321, at *3 and quoting *W. Coast*, 914 A.2d at 646); *Senetas Corp., Ltd. v. DeepRadiology Corp.*, 2019 WL 3430481, at *4 n.43 (Del. Ch. July 30, 2019) (quoting *Graulich v. Dell Inc.*, 2011 WL 1843813, at *5 (Del. Ch. May 16, 2011), which quotes *W. Coast*, 914 A.2d at 646); *Hoeller v. Tempur Sealy Int'l Inc.*, 2019 WL 551318, at *7 & n.71 (Del. Ch. Feb. 12, 2019) (quoting *W. Coast*, 914 A.2d at 646); *Beatrice Corwin Living Irrevocable Tr. v. Pfizer, Inc.* (*Pfizer 220*), 2016 WL 4548101, at *52 & n.52 (Del. Ch. Aug. 31, 2016, corrected Sept. 1, 2016) (citing *S.E. Pa. Transp. Auth. v. Abbvie, Inc.*, 2015 WL 1753033, at *11 (Del. Ch. Apr. 15, 2015), *aff'd*, 132 A.3d 1 (Del. 2016) (TABLE), and *W. Coast*, 914 A.2d at 646); *Graulich*, 2011 WL 1843813, *5 (quoting *W. Coast*, 914 A.2d at 646).

[11] *See Hoeller*, 2019 WL 551318, at *7; *Facebook Compensation 220*, 2019 WL 5579488, at *10 n.119; *Senetas*, 2019 WL 3430481, at *4 n.43.

[12] *See Pfizer 220*, 2016 WL 4548101, at *7; *Abbvie*, 2015 WL 175033, at *12; *Graulich*, 2011 WL 1843813, at *8.

27

Section 220 only requires that a stockholder state a proper purpose. *See* 8 *Del. C.* § 220(b). The Delaware Supreme Court has not gone further by requiring that a stockholder also say what it will do with the documents it receives. A stockholder may choose to say what it will do with the fruits of the inspection, and if it does, then a court can take those uses into account. Or, as in *West Coast* and *Beiser*, a court may be able to draw an inference or reach a conclusion about what the stockholder intends to do. But a stockholder need not both articulate a proper purpose for inspection and commit in advance to the ends to which it will put the books and records.[13]

Of course, the fact that Section 220 does not require a stockholder to say how it will use the fruits of the inspection does not render the stockholder's intentions irrelevant. If a corporation challenges whether the stockholder's proper purpose is bona fide, then a stockholder can point to how it plans to use the materials as evidence that its claimed purpose is its actual purpose. If a stockholder cannot identify a credible potential end use,

---

[13] In practice, the purpose-plus-an-end test operates as a requirement that stockholders include magic words in their demands. Sophisticated stockholders will know to include a broad set of possible uses in a demand. Those who only review Section 220(b), articulate the recognized purpose of exploring corporate wrongdoing, but fail to identify a range of possible uses for the books and records will risk having their inspection rights denied. A Section 220 inspection should not turn on the inclusion of magic words. *See Sec. First*, 687 A.2d at 567 ("The failure of plaintiff's key witness to articulate certain 'magic words' while testifying at trial is not fatal to a Section 220 action."); *see also Dobler v. Montgomery Cellular Hldg. Co.*, 2001 WL 1334182, at *7 & n.28 (Del. Ch. Oct. 19, 2001) (ordering production of a category of books and records even though expert failed to testify that the materials were essential; "As the Court does not grant relief because the 'magic' words are used, the Court conversely does not deny relief for failure to use the 'magic' words, provided, of course, that the requisite showing is otherwise accomplished.").

then the court may infer that the stockholder's stated purpose is not its actual purpose. *See Marathon P'rs v. M & F Worldwide Corp.*, 2004 WL 1728604, at \*8 (Del. Ch. July 30, 2004).

In this case, the Demand did not recite ends to which the plaintiffs might put the books and records. For the reasons discussed, they were not required to do so. Instead, the plaintiffs reserved the ability to consider all possible courses of action that their investigation might warrant pursuing. *See* JX 50 at '012.

AmerisourceBergen points out that the Demand mentions litigation. Dkt. 20 at 27. The fourth purpose expresses the plaintiffs' intent "to evaluate possible litigation or other corrective measures with respect to some or all of these matters." JX 50 at '012–13. The Demand thus acknowledged that one possible use was "to evaluate possible litigation," but it did not restrict the stockholders to that end. *See Graulich*, 2011 WL 1843813, at \*7; *Norfolk Cty.*, 2009 WL 353746, at \*10–12.

Through discovery, AmerisourceBergen obtained the plaintiffs' engagement letters with their counsel. Those letters contain references to litigation, but the references are not dispositive. The plaintiffs would need their counsel to conduct litigation, so it is logical that the engagement letters would refer to it. The plaintiffs would not need their counsel to use the fruits of their investigation for other ends.

AmerisourceBergen cannot cabin the Demand by asserting that the plaintiffs only want to sue. The plaintiffs in this case seek to explore corporate wrongdoing. They are not limited to pursuing litigation. They may decide to file a lawsuit, or they may pursue other means of "effectively address[ing] the problem." *Saito*, 806 A.2d at 115.

29

### c.  AmerisourceBergen's Actionable-Wrongdoing Requirement

Having interpreted the Demand as "confined to investigating a *Caremark* claim," AmerisourceBergen argues that to obtain books and records, the plaintiffs "must present evidence demonstrating a credible basis to suspect actionable wrongdoing on the part of the Board." Dkt. 20 at 2; *accord* Dkt. 37 at 1. AmerisourceBergen maintains that the evidence does not support actionable wrongdoing on the part its directors, so the plaintiffs cannot obtain any books and records.

AmerisourceBergen's argument fails for a threshold reason. The plaintiffs are not seeking books and records for the sole purpose of investigating a potential *Caremark* claim. They can use the fruits of their investigation for other purposes. *See supra* Part II.A.1.b.

Examined in its own right, AmerisourceBergen's actionable-wrongdoing requirement imposes an onerous burden on stockholders that goes beyond the standard established in *Seinfeld*. AmerisourceBergen contends that a Section 220 plaintiff must introduce evidence from which the court can infer the existence of an actionable claim against the board of directors. AmerisourceBergen then relies on decisions that have granted Rule 23.1 motions to argue that the plaintiffs in this case failed to introduce evidence from which the court could infer the existence of an actionable claim. In substance, AmerisourceBergen contends that to establish a credible basis to suspect

30

actionable wrongdoing, a plaintiff must introduce evidence sufficient to support a claim that could survive a pleading-stage motion to dismiss pursuant to Rule 23.1.[14]

The Delaware Supreme Court has not required a stockholder seeking books and records to introduce evidence from which a court could infer the existence of an actionable claim. The *Seinfeld* test only requires that a stockholder establish, by a preponderance of the evidence, that there is a credible basis to infer possible corporate wrongdoing or mismanagement. The Delaware Supreme Court has explained that this standard strikes "an appropriate balance between providing stockholders who can offer some evidence of possible wrongdoing with access to corporate records and safeguarding the right of the corporation to deny requests for inspections that are based only upon suspicion or curiosity." *Seinfeld*, 909 A.2d at 118.

The Delaware Supreme Court has repeatedly urged stockholders to use Section 220 to investigate possible wrongdoing *before* filing derivative actions, recognizing that without doing so, plaintiffs typically lack the facts necessary to plead an actionable claim against the board that can survive a Rule 23.1 motion.[15] The logical implication of this

---

[14] On at least one occasion, AmerisourceBergen frames the requirement in more extreme form, asserting to obtain books and records, "[s]tockholders must prove bad-faith conduct by the directors." Dkt. 37 at 2. That standard would require proof that wrongdoing actually occurred, contrary to *Seinfeld* and numerous other Delaware cases. *See supra* Part II.A.1.

[15] *See, e.g.*, *King v. VeriFone Hldgs., Inc.*, 12 A.3d 1140, 1145–46 (Del. 2011) ("Delaware courts have strongly encouraged stockholder-plaintiffs to utilize Section 220 before filing a derivative action, in order to satisfy the heightened demand futility pleading requirements of Court of Chancery Rule 23.1." (footnotes omitted)); *Beam ex rel. Martha*

message is that to obtain books and records, a stockholder does not have to introduce

evidence from which a court could infer the existence of an actionable claim. The Delaware

Supreme Court has never equated the credible-basis standard with an actionable-claim

requirement.[16]

---

*Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1056–57 (Del. 2004) ("Both this Court and the Court of Chancery have continually advised plaintiffs who seek to plead facts establishing demand futility that the plaintiffs might successfully have used a Section 220 books and records inspection to uncover such facts."); *Brehm v. Eisner*, 746 A.2d 244, at 266–67 (Del. 2000) (rejecting argument "that the system of requiring a stockholder to plead particularized facts in a derivative suit is basically unfair because the Court will not permit discovery under Chancery Rules 26–37 to marshal the facts necessary to establish that pre-suit demand is excused," reasoning that "[p]laintiffs may well have the 'tools at hand' to develop the necessary facts for pleading purposes . . . [by] seek[ing] relevant books and records of the corporation under Section 220"); *Rales v. Blasband*, 634 A.2d 927, 934 n.10 (Del. 1993) (rejecting argument that the requirement of particularized pleading was unfair because stockholders could use Section 220 "to investigate the possibility of corporate wrongdoing"). *See generally La. Mun. Police Empls.' Ret. Sys. v. Pyott (Pyott I)*, 46 A.3d 313, 342–47 (Del. Ch. 2012) (describing dynamics of litigation when stockholders file suit before seeking books and records), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013).

[16] The closest case is *Seinfeld*, where a stockholder sought to investigate a compensation decision that the board had made, and where the stockholder acknowledged in his deposition that he had no factual support for his claim that mismanagement had taken place. *See Seinfeld*, 909 A.2d at 119. The Delaware Supreme Court held that a disagreement with the board's business judgment is not evidence of wrongdoing. *Id.* at 120. The decision did not hold that a stockholder must always submit evidence of board-level wrongdoing sufficient to rebut the business judgment rule, threaten the directors with liability, or otherwise establish demand futility. Rather, the *Seinfeld* decision turned on the stockholder's concession and his attempt to investigate a board decision involving the hiring, firing, and compensation of management, which lies at the heart of a board's business judgment. Throughout the decision, the Delaware Supreme Court stressed that stockholders could obtain books and records by presenting some evidence from which a court could infer possible mismanagement or corporate wrongdoing sufficient to warrant further investigation. *See id.* at 122–25. The Delaware Supreme Court did not require that

The Delaware Supreme Court's decision in *Brehm* demonstrates that to obtain books and records, a stockholder's evidence of corporate wrongdoing need *not* be sufficient to establish an actionable claim. This court dismissed the plaintiff's complaint pursuant to Rule 23.1, and the Delaware Supreme Court affirmed. *See In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 361 (Del. 1998), *aff'd in pertinent part sub nom. Brehm*, 746 A.2d at 244. Despite agreeing that the claim was not actionable, the Delaware Supreme Court reversed the with-prejudice aspect of this court's dismissal so that the plaintiff could use Section 220 to obtain "relevant books and records of the corporation." *Brehm*, 746 A.2d at 266. If an actionable claim was needed to obtain books and records, then the plaintiff in *Brehm* could not have met that test. Instead, the plaintiff obtained books and records and used them to plead a complaint that survived a motion to dismiss. *See In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 291 (Del. Ch. 2003).

A similar sequence of events unfolded in the *Saito* litigation. This court dismissed the plaintiffs' *Caremark* claims pursuant to Rule 23.1, but did so without prejudice so that the stockholders could use Section 220. *Ash v. McCall*, 2000 WL 1370341, at *1, *15 & n.56 (Del. Ch. Sept. 15, 2000). When the stockholders requested books and records, the corporation disputed whether they had a proper purpose. Despite having held that the stockholders could not plead facts sufficient to support an actionable claim, this court held that they had established a proper purpose:

---

the plaintiffs produce evidence of board-level conflicts or exposure to liability sufficient to defeat a Rule 23.1 motion and establish an actionable claim. *See id.*

I find that the record in this case evinces credible evidence of possible wrongdoing. McKesson HBOC was forced to restate its financial statements to reflect accounting irregularities totaling $325 million. This led to the public admission of the irregularities, the termination of certain high-ranking executives, and the institution of criminal proceedings by federal authorities. While the ultimate involvement or culpability, if any, of the defendant in this wrongdoing is unclear on this record, the plaintiff has met his burden at this stage to gain access to books and records to examine the defendant's conduct. Thus, to the extent that the plaintiff seeks access to the books and records of the defendant to foster this purpose, in general, I find that he has set forth a proper purpose for a demand.

*Saito*, 2001 WL 818173, at *4.[17]

Consistent with these outcomes, a phalanx of Delaware decisions have dismissed *Caremark* claims for failing to plead demand futility, while commenting that the plaintiffs could have used Section 220 to obtain books and records that might have led to a different

---

[17] Two other cases point in the same direction. In *CNET*, a federal district court held that a stockholder had failed to plead a *Caremark* claim, but dismissed the case without prejudice so that the stockholder could use Section 220. *See CNET*, 934 A.2d at 915. No one disputed that the stockholder could establish a proper purpose. *See id.* at 917–18.

In *Security First*, the Delaware Supreme Court permitted a stockholder to inspect books and records based on quite meager allegations of wrongdoing. The target corporation had entered into a merger agreement that would have resulted in its shares being converted into cash at a premium to the market price, but the corporation later terminated the agreement and paid the acquirer the termination fee and its expenses. *See* 687 A.2d at 565–66. Citing little more than the fact of termination, a stockholder sought to investigate the possibility of mismanagement in connection with the termination. The corporation responded that the merger failed because of "a difference of philosophies" between the companies, but the stockholder argued that this explanation was dubious because prudent management would have researched the two companies' philosophies before agreeing to merge. *Id.* at 567 (internal quotation marks omitted). This court found that the stockholder had established a credible basis to suspect possible wrongdoing, and the high court agreed. *Id.* The stockholder's inference about possible wrongdoing could not have supported an actionable claim, yet it was sufficient to establish a proper purpose. *Id.* at 568–69.

result.[18] If the plaintiffs could have obtained books and records only by introducing evidence that could support an actionable claim, then the stockholders could not have met the test. Yet these decisions admonished the plaintiffs for not having used the "tools at hand" to develop their claims before filing suit.[19]

---

[18] *See, e.g.*, *Wood v. Baum*, 953 A.2d 136, 144 (Del. 2008) (affirming dismissal of *Caremark* claim under Rule 23.1; noting that "plaintiff could have, but chose not to, make a books and records request"); *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *13 (Del. Ch. Jan. 11, 2010) (dismissing *Caremark* claim under Rule 23.1 where plaintiff did not use Section 220); *Desimone v. Barrows*, 924 A.2d 908, 951 (Del. Ch. 2007) (noting that plaintiff filed complaint without using Section 220 and therefore had "no idea what the [board's] investigation actually entailed and is unable to plead any facts about what the . . . board did, when they did it, what they discussed, what conclusions they reached, and why the board did or did not do anything"); *Rattner v. Bidzos*, 2003 WL 22284323, at *14 (Del. Ch. Sept. 30, 2003) ("[A] symptomatic and ultimately fatal defect to all of Rattner's claims is a failure to plead facts with particularity. . . . [T]he books and records provisions of 8 *Del. C.* § 220 . . . might have been helpful here . . . ."); *In re Citigroup Inc. S'holders Litig.*, 2003 WL 21384599, at *3 (Del. Ch. June 5, 2003) ("Despite its prolixity, the Amended Complaint completely fails to set forth adequate reasons why demand is excused. Perhaps the absence of particularized facts excusing demand is the product of a race to the courthouse. It is certainly a result of the plaintiffs' failure to use the 'tools at hand' . . . ."), *aff'd sub nom. Rabinovitz v. Shapiro*, 839 A.2d 666 (Del. 2003) (TABLE); *Guttman v. Huang*, 823 A.2d 492, 493 (Del. Ch. 2003) ("Having failed to heed the numerous admonitions by our judiciary for derivative plaintiffs to obtain books and records before filing a complaint, the plaintiffs have unsurprisingly submitted an amended complaint that lacks particularized facts compromising the impartiality of the . . . board that would have acted on a demand."); *id.* at 504 (noting that a § 220 action "could have provided the basis for the pleading of particularized facts"); *White v. Panic*, 793 A.2d 356, 371–72 (Del. Ch. 2000) (dismissing *Caremark* claim after noting that the plaintiff failed to use Section 220), *aff'd*, 783 A.2d 543, 556–57 (Del. 2001) ("[T]his case demonstrates the salutary effects of a rule encouraging plaintiffs to conduct a thorough investigation, using the 'tools at hand' including the use of actions under 8 *Del. C.* § 220 for books and records, before filing a complaint.").

[19] More recently, stockholders have sought and obtained books and records before filing *Caremark* claims, and this court still has held that their complaints failed to state actionable claims that could survive a Rule 23.1 motion. *See, e.g.*, *Rojas ex rel. J.C. Penney*

To support its contrary argument that a stockholder seeking to investigate corporate wrongdoing must introduce evidence that would support an actionable *Caremark* claim, AmerisourceBergen relies on a recent line of cases from this court.[20] The pivotal decision involved a stockholder who sought books and records to explore potential wrongdoing at Pfizer, Inc. The company had represented in its 2013 annual report that it was not practicable to calculate a deferred tax allowance for foreign earnings. At trial, the stockholder presented testimony from a tax expert who testified that it was practicable to calculate the deferred tax allowance, providing a credible basis from which the court could infer that Pfizer's disclosure was inaccurate. *See Pfizer 220*, 2016 WL 4548101, at *1–3.

---

*Co. v. Ellison*, 2019 WL 3408812, at *1 (Del. Ch. July 29, 2019); *Tilden ex rel. Blucora, Inc. v. Cunningham*, 2018 WL 5307706, at *9 (Del. Ch. Oct. 26, 2018); *Okla. Firefighters Pension & Ret. Sys. ex rel. Citigroup, Inc. v. Corbat*, 2017 WL 6452240, at *12, *14 (Del. Ch. Dec. 18, 2017); *Horman ex rel. United Parcel Serv., Inc. v. Abney*, 2017 WL 242571, at *1 (Del. Ch. Jan. 19, 2017); *Reiter ex rel. Capital One Fin. Corp. v. Fairbank*, 2016 WL 6081823, at *1 (Del. Ch. Oct. 18, 2016); *Melbourne Mun. Firefighters' Pension Tr. Fund ex rel. Qualcomm, Inc. v. Jacobs*, 2016 WL 4076369, at *1, *5 (Del. Ch. Aug. 1, 2016); *In re Gen. Motors Co. Deriv. Litig.*, 2015 WL 3958724, at *1 (Del. Ch. June 26, 2015); *see also City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 51 & n.3 (Del. 2017). These adverse rulings on Rule 23.1 motions indicate that the plaintiffs would not have been able to meet a standard for obtaining books and records that required them to plead an actionable *Caremark* claim, yet the plaintiffs conducted inspections. Perhaps the companies provided documents voluntarily, confident that they would show an absence of wrongdoing. Or perhaps the companies did not believe that the plaintiffs would be required to establish an actionable *Caremark* claim to obtain books and records and produced the documents rather than disputing whether there was a credible basis to suspect that corporate wrongdoing existed. I would bet on the latter.

[20] *See Facebook 220*, 2019 WL 2320842; *Hoeller*, 2019 WL 551318; *Pfizer 220*, 2016 WL 4548101.

Pfizer disputed the expert's opinion, but the court held that the problem with the plaintiff's case went deeper:

> [E]ven if the plaintiffs established that the calculation was practicable, they have not offered a credible basis from which this Court may infer that Pfizer's Board, which relied on KPMG's opinion, engaged in any mismanagement or wrongdoing in approving Pfizer's financial disclosures or in assuring the company's compliance with accounting standards.

*Id.* at *4. Elaborating, the court held that a stockholder must provide "some evidence from which a *Caremark* claim could be inferred" and that establishing a credible basis to infer management or wrongdoing was not enough:

> Of course, a stockholder seeking inspection under Section 220 need not prove a *Caremark* claim, or even plead a claim that would survive a motion to dismiss a plenary action that asserted a *Caremark* claim. A stockholder must, however, provide some evidence from which a *Caremark* claim could be inferred. That is, where a stockholder's sole purpose for investigating mismanagement is to determine whether the board breached its duty of oversight, it is not enough to provide a credible basis from which the Court may infer that management or lower-level employees engaged in wrongdoing. The stockholder also must provide some evidence from which the Court may infer that the board utterly failed to implement a reporting system or ignored red flags.

*Id.* at *5.

With the test framed in this fashion, the plaintiff could not meet it. As the court found,

> The plaintiffs' evidence at trial and arguments in their briefs did not address Pfizer's reporting system, or lack thereof, or whether any "red flags" might have been raised but ignored by Pfizer's board. Nor is there anything in the record from which the Court might infer the absence of such a reporting system or the presence of such red flags. The plaintiffs sought to prove at trial that Pfizer's statement that the Reparation Tax calculation is not practicable may not be accurate and therefore is a "positive violation" of the law. It is debatable whether the plaintiffs' evidence at trial satisfied the minimum quantum of evidence necessary to establish a credible basis that

> Pfizer's practicability statement is inaccurate. The gap the plaintiffs failed to bridge is providing any evidence permitting even an inference that the board was aware, or should have been aware, of this inaccuracy.

*Id*. In fairness to the plaintiff, that is the type of evidence that typically would only appear in internal corporate documents, which is what the plaintiff sought to obtain by seeking books and records.

The *Pfizer 220* court suggested that it was applying a less demanding standard than the pleading-stage test that would apply under Rule 23.1. *See id.* ("Of course, a stockholder seeking inspection under Section 220 need not . . . plead a claim that would survive a motion to dismiss a plenary action that asserted a *Caremark* claim."). But in practice, the *Pfizer 220* standard is higher. It requires that a plaintiff "provide some evidence from which a *Caremark* claim could be inferred." *Id.* When pleading a claim for purposes of Rule 23.1, a plaintiff "need not plead evidence." *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984) (subsequent history omitted); *accord Brehm*, 746 A.2d at 254 ("[T]he pleader is not required to plead evidence.")

The *Pfizer 220* standard and the Rule 23.1 standard are functionally equivalent for purposes of drawing inferences. The Delaware Supreme Court has made clear that when ruling on a Rule 23.1 motion, "[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged . . . ." *Brehm*, 746 A.2d at 255; *accord Beam*, 845 A.2d at 1048; *see Del. Cty. Empls.' Ret. Fund v. Sanchez*, 124 A.3d 1017, 1022 (Del. 2015). Thus, to obtain books and records under the *Pfizer 220* standard, a stockholder must introduce evidence providing a *credible basis* to infer the existence of a *Caremark* claim, while to survive a Rule 23.1 motion, a stockholder must make

38

particularized factual allegations providing a *reasonable basis* to infer the existence of a *Caremark* claim. The distance between a credible basis and a reasonable basis seems too small for workable distinctions. "Credible" is defined as "offering a reasonable basis for being believed."[21] If an inference is unreasonable, then it is not credible.

Both the *Pfizer 220* standard and the Rule 23.1 standard are likely insurmountable for a stockholder who can point to corporate wrongdoing, but who lacks internal information about what the directors actually did or knew. Under *Seinfeld*, the operative question is whether a stockholder has shown a credible basis to suspect possible mismanagement or wrongdoing at the corporation. This standard does not require tying the mismanagement or wrongdoing to the board.[22]

---

[21] *Credible*, Merriam-Webster, https://www.merriam-webster.com/dictionary/credible (last visited Jan. 9, 2020); *see Webster's Ninth New Collegiate Dictionary* 305 (1990) ("**1 :** offering reasonable grounds for being believed"); *Credible*, Dictionary.com, https://www.dictionary.com/browse/credible (last visited Jan. 9, 2020) (listing "reasonable" as a synonym for credible).

[22] A parenting analogy may be helpful. Assume that you have heard from several sources that unidentified members of your teenager's sports team may be selling illegal drugs. Further assume that your teen seems flush with cash and has recently made an expensive technology purchase. There is no evidence that would directly tie your teen to selling drugs and warrant making accusations, and it is possible (and hopefully likely) that your teen is not selling drugs. But there is a credible basis to suspect possible wrongdoing and hence conduct an investigation to obtain some basic information. If there is evidence that other authorities are involved (perhaps you received a voicemail from the school principal asking you to call), then the need for an investigation becomes stronger and the scope likely broader. Obviously corporations are not children, and stockholders are not parents, but the analogy helps illustrate the distinction between actionable wrongdoing and a credible basis to suspect possible wrongdoing worthy of investigation. The latter is all that *Seinfeld* requires.

Evaluating whether a stockholder has shown a credible basis to suspect possible wrongdoing requires a judgment grounded in the facts of a particular case. Generally speaking, when a corporation has suffered a trauma, and when there is a credible basis to suspect that the corporation has violated positive law or government regulations, then some level of investigation is warranted. *See Facebook 220*, 2019 WL 2320842, at \*14–15.

The plaintiffs in this case have shown a credible basis to suspect possible mismanagement or wrongdoing that is worthy of further investigation. *See supra* Part II.A.1.a. That is all that Section 220 and *Seinfeld* require.

### d. The Section 102(b)(7) Defense

Again relying on its counterfactual interpretation of the Demand as "confined to investigating a *Caremark* claim," AmerisourceBergen argues that the plaintiffs cannot obtain books and records because AmerisourceBergen has an exculpatory provision in its certificate of incorporation and the plaintiffs have not introduced evidence sufficient to support an inference of a non-exculpated claim. *See* Dkt. 20 at 28–29. As explained above, AmerisourceBergen's argument fails for the threshold reason that the plaintiffs are not seeking books and records for the sole purpose of investigating a potential *Caremark* claim. They can use the fruits of their investigation for other purposes. *See supra* Part II.A.1.b. It also fails because the plaintiffs' inspection rights do not depend on the existence of an actionable claim for damages against the board of directors. The plaintiffs need only establish a credible basis from which a court can infer possible mismanagement or corporate wrongdoing, which they have done. *See supra* Part II.A.1.c.

AmerisourceBergen's argument also fails in its own right. The issues that the plaintiffs wish to investigate could well lead to non-exculpated claims. The duty of loyalty and its subsidiary element of good faith require that directors pursue the best interests of the corporation and its stockholders. *See In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 53 (Del. 2006); *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996). A failure to act in good faith may be shown if the directors act with a purpose other than that of advancing the best interests of the corporation, such as by consciously failing to attempt to take action in good faith to prevent a corporate trauma. *See Marchand v. Barnhill*, 212 A.3d 805, 820–21 (Del. 2019); *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

Directors cannot take an ostrich-like approach to their fiduciary obligations, and so they must take active steps to oversee the operations of the corporation and become informed about the risks confronting the company. In the words of the seminal oversight case, directors must "attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists . . . ." *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996). The resulting information and reporting systems must be "reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance." *Id.* "As with any other disinterested business judgment, directors have great discretion to design context- and industry-specific approaches tailored to their companies' businesses and resources." *Marchand*, 212 A.3d at

821. The "bottom-line requirement" is for the board to "make a good faith effort—*i.e.,* try—to put in place a reasonable board-level system of monitoring and reporting." *Id.*

Having put a system of reporting and oversight controls in place, the directors must "then monitor it." *Id.* A board of directors can be found to have breached its duty under this dimension of the law if the directors implemented a system of controls, then "consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370. "When a plaintiff can plead an inference that a board has undertaken no efforts to make sure it is informed of a compliance issue intrinsically critical to the company's business operation, then that supports an inference that the board has not made [a] good faith effort . . . ." *Marchand*, 212 A.3d 823. Particularly when dealing with "mission critical" regulatory and compliance risks, directors must make a good faith effort to put in place a reasonable board-level system of monitoring and reporting. *Id.* at 824. Directors may fall short of this obligation if they simply rely on management to report to their board at their discretion. *See id.* at 823–24. Directors also may fall short if they rely on regulatory oversight mechanisms imposed by law, which "are not typically directed at the board." *Id.* at 823.

If directors learn of information that would put them on notice of a threatened corporate trauma—the proverbial red flag—then they must take action in good faith to address it. A claim that directors had notice of serious misconduct and simply brushed it off or otherwise failed to investigate states a claim for breach of duty. *See, e.g.*, *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *5 (Del. Ch. Feb. 13,

2006), *aff'd*, 911 A.2d 802 (Del. 2006) (TABLE); *Guttman*, 823 A.2d at 507. A board that fails to act in the face of such information makes a conscious decision, and the decision not to act is just as much of a decision as a decision to act. *See Krieger v. Wesco Fin. Corp.*, 30 A.3d 54, 58 (Del. Ch. 2011); *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *10 (Del. Ch. Jan. 14, 1991).

Directors must be particularly scrupulous when overseeing the corporation's compliance with its legal obligations. "Delaware law does not charter law breakers. Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue 'lawful business' by 'lawful acts.'" *Massey*, 2011 WL 2176479, at *20 (quoting 8 *Del. C.* §§ 101(b), 102). "[A] fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law."[23] When directors consciously fail to prevent violations of positive law, then they act in bad faith.[24]

In their capacities as corporate fiduciaries, officers owe the same duties to the corporation and its stockholders as directors. *Gantler v. Stephens*, 965 A.2d 695, 708–09

---

[23] *Id.*; *accord Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004) ("Under Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity."); *Guttman*, 823 A.2d at 506 n.34 ("[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey.").

[24] *See Stone*, 911 A.2d at 369; *Disney*, 906 A.2d at 67; *Kandell ex rel. FXCM, Inc. v. Niv*, 2017 WL 4334149, at *16 (Del. Ch. Sept. 29, 2017).

(Del. 2009). Officers also are fiduciaries in their capacities as agents who report to the board of directors.[25] Within this relationship, officers have a duty to comply with the board's directives. *See Restatement (Third) of Agency* § 8.09 (Am. Law Inst. 2006). Stated in the negative, an officer "may not act in a manner contrary to the express desires of the board of directors." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 775 n.570 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006). If a board of directors has given an officer instructions about how to implement a compliance program, monitor its results, and report back to the board, then the officer can breach his duties as an agent by failing to carry out the board's instructions. Both as corporate fiduciaries and as agents, officers also have a

---

[25] *See* 8 *Del. C.* § 141(a). A vibrant debate exists over the extent to which the full agency law regime should apply to officers. One of the principal disputes appears to be whether officers should be liable for simple negligence, like agents generally, or whether some form of more deferential standard of review, such as the business judgment rule, should apply to their decisions. This decision does not speculate on that issue. For examples of the debate over the standard of review, see Lyman Johnson & Robert Ricca, *Reality Check on Officer Liability*, 67 Bus. Law. 75 (2011); Paul Graf, *A Realistic Approach to Officer Liability*, 66 Bus. Law. 315 (2011); Lyman P.Q. Johnson & David Millon, *Recalling Why Corporate Officers Are Fiduciaries*, 46 Wm. & Mary L. Rev. 1597 (2005); Lawrence A. Hamermesh & A. Gilchrist Sparks III, Reply, *Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson*, 60 Bus. Law. 865 (2005); Lyman P.Q. Johnson, *Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson*, 60 Bus. Law. 439 (2005); A. Gilchrist Sparks, III & Lawrence A. Hamermesh, *Common Law Duties of Non-Director Corporate Officers*, 48 Bus. Law. 215 (1992). For examples of scholarly analyses addressing other aspects of the officer's role as corporate agent, see Megan W. Shaner, *The (Un)Enforcement of Corporate Officers' Duties*, 48 U.C. Davis L. Rev. 271 (2014); Amitai Aviram, *Officers' Fiduciary Duties and the Nature of Corporate Organs*, 2013 U. Ill. L. Rev. 763; Megan W. Shaner, *Restoring the Balance of Power in Corporate Management: Enforcing an Officer's Duty of Obedience*, 66 Bus. Law. 27 (2010); Donald C. Langevoort, *Agency Law Inside the Corporation: Problems of Candor and Knowledge*, 71 U. Cin. L. Rev. 1187 (2003).

duty to provide the board of directors with information that the directors need to carry out their duties and perform their statutory role.[26]

Given that the plaintiffs are currently seeking only to investigate possible corporate wrongdoing, they have not yet tried to plead a plenary claim for breach of fiduciary duty against specific individuals. As this decision has discussed, Delaware Supreme Court precedent does not require an actionable claim as a predicate to a books-and-records inspection, and it would upset the proper balancing of interests in Section 220 proceedings to effectively require one. *See supra* Part II.A.1.a. But it is apparent, even at this early stage, that the fruits of a books and records investigation could potentially lead to non-exculpated claims.

---

[26] *See Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *34 (Del. Ch. July 12, 2010) ("[W]hen a corporate officer is aware of financial misreporting that involves high-level management and that has evaded the corporation's auditors, and nonetheless certifies that he is not aware of any material weakness in the company's internal controls, he is making a false statement and failing to bring material information to the board, in breach of his duty of loyalty."); *Ryan v. Gifford*, 935 A.2d 258, 272 (Del. Ch. 2007) (holding that complaint stated claim for breach of the duty of loyalty against CFO and vice president who knew about backdating but "kept silent"); *Hoover Indus., Inc. v. Chase*, 1988 WL 73758, at *2 (Del. Ch. July 13, 1988) ("A director does breach his duty of loyalty if he knows the company has been defrauded and does not report what he knows to the board or to an appropriate committee of the board, at the very least when he is involved in the fraud and keeps silent in order to escape detection."); *see also Lewis v. Vogelstein*, 699 A.2d 327, 334 (Del. Ch. 1997) ("[S]ince the relationship between a principal and agent is fiduciary in character, the agent . . . must act not only with candor, but with loyalty."). *See generally Restatement (Third) of Agency* § 8.11 (Am. Law Inst. 2006) (describing agent's duty to provide principal with facts that the agent knows); Langevoort, *supra*, at 1191–1208 (discussing duty of candor for officers under agency principles and corporate law).

One possibility is that AmerisourceBergen's directors and officers may have breached their fiduciary duty of loyalty by consciously permitting the company to violate positive law. Taken as a whole, the evidence surrounding the volume of AmerisourceBergen's distribution of opioids through rogue pharmacies, the minimal levels of reporting of suspicious orders, and the changes over time in reporting levels is sufficient to support an inference that AmerisourceBergen's directors and officers may have pursued the maximization of profit at the expense of legal compliance. As discussed in the Factual Background, the West Virginia Report indicates that after its problems with the DEA in 2007, AmerisourceBergen initially adopted and adhered to a meaningful program of monitoring and oversight that involved identifying suspicious orders, reporting them to the DEA, and taking action against offending pharmacies. After 2013, however, AmerisourceBergen began reporting dramatically lower numbers of suspicious orders. By 2016, despite shipping 11.5 million doses of opioids to West Virginia in that year, AmerisourceBergen reported only three suspicious orders. JX 41 at '253. In 2017, AmerisourceBergen reported only five. *Id.* at '252–53. AmerisourceBergen also stopped taking action to terminate offending pharmacies. *See id.* at '254. The Missouri Report documented similar issues in Missouri. *See* JX 38. The NYAG Complaint likewise states, "The one area in which AmerisourceBergen has consistently stood out as compared to its major competitors is its unwillingness to identify suspicious orders, even among customers that regularly exceeded their thresholds and presented multiple red flags of diversion." JX 48 ¶ 727.

46

It is also possible that AmerisourceBergen's directors and officers breached their fiduciary duties by consciously failing to monitor a mission-critical source of regulatory risk. The same pattern of evidence that supports an inference that AmerisourceBergen's senior officers and directors may have consciously permitted AmerisourceBergen to violate the law also supports the lesser inference of consciously failing to monitor a mission-critical source of regulatory risk.

There is also a credible basis from which to infer that AmerisourceBergen's directors and officers possibly breached their fiduciary duties by knowingly failing to respond to red flags. Because it is possible to infer that fiduciaries at AmerisourceBergen who were actively monitoring a compliance system would have detected the company's regulatory issues and taken action, one reasonable follow-on inference is that the fiduciaries were not engaging in monitoring. Another reasonable follow-on inference is that the fiduciaries engaged in monitoring, identified the issues, and ignored them, such as by failing to implement additional compliance measures in response to gaps in the compliance program or by consciously failing to take remedial steps in response to problems that the compliance system revealed.

A books and records investigation into the potential wrongdoing at AmerisourceBergen thus may support non-exculpated claims for breach of the duty of

loyalty. It also could support potential claims against AmerisourceBergen's senior officers, and Section 102(b)(7) does not authorize exculpation for officers.[27]

It would be premature to allow AmerisourceBergen to rely on its exculpatory provision to foreclose an inspection into possible corporate wrongdoing. The inspection could lead to non-exculpated claims.

### e. The Time-Bar Defense

In yet another merits defense, AmerisourceBergen contends that the plaintiffs lack a proper purpose because any claims they might hope to bring based on the information that they seek would be time-barred. According to AmerisourceBergen, all of the issues that the plaintiffs seek to explore "relate to events that occurred three or more years ago." Dkt. 20 at 40. AmerisourceBergen concludes that any claim that the plaintiffs might file would be barred by laches because of the analogous three-year statute of limitations. *Id.*

As with the Section 102(b)(7) defense, the time-bar defense fails for two threshold reasons. First, as previously discussed, the Demand is not limited to pursuing derivative litigation. *See supra* Part II.A.1.b. The plaintiffs are entitled to use the information that they obtain to identify, evaluate, and pursue alternative remedies and corrective measures. Second, the plaintiffs' inspection rights do not turn on the existence of an actionable claim

---

[27] 8 *Del. C.* § 102(b)(7) (authorizing "[a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director . . ."); *Gantler*, 965 A.2d 695 at 709 n.37 ("Although legislatively possible, there currently is no statutory provision authorizing comparable exculpation of corporate officers.").

against the directors. The plaintiffs need only establish a credible basis to infer possible corporate management or wrongdoing, which they have done. *See supra* Part II.A.1.c.

Regardless, it is not clear at this stage that the plaintiffs' derivative claims would be time-barred. Although a stockholder lacks a proper purpose for an inspection that relates solely to time-barred derivative claims, it must be clear that any claims would be barred. *See Graulich*, 2011 WL 1843813, at *6. Rarely will a court be able to reach that conclusion because the scope of merits-related discovery in a summary Section 220 proceeding is limited, and this court has been hesitant in Section 220 proceedings to permit "the factual development necessary to assess fairly . . . a time-bar affirmative defense . . . ." *Amalgamated Bank v. UICI*, 2005 WL 1377432, at *2 (Del. Ch. June 2, 2005).

It is possible that doctrines like fraudulent concealment or equitable tolling could enable the plaintiffs to pursue otherwise stale claims. *See Fike v. Ruger*, 754 A.2d 254, 260–61 (Del. Ch. 1999), *aff'd*, 752 A.2d 112 (Del. 2000). It is also possible that the plaintiffs could show a continuing wrong. *See Saito*, 806 A.2d at 117 (rejecting argument that stockholder could not obtain books and records pre-dating the stockholder's purchase of shares; noting that "the potential derivative claim may involve a continuing wrong that both predates and postdates the stockholder's purchase date"). Or the plaintiffs may be able to use earlier information to support non-time-barred claims, such as by citing earlier conduct as evidence of intent, knowledge, or lack of mistake. *See, e.g.*, *id.*; *Pyott I*, 46 A.3d at 354–55. The plaintiffs also may use the earlier information to show that the directors engaged in "a sustained or systematic failure . . . to exercise oversight." *Caremark*, 698 A.2d at 971.

It would be premature to determine in this summary proceeding on an abbreviated record that any possible claim that the plaintiffs might bring would be time-barred. AmerisourceBergen thus cannot undercut the plaintiffs' otherwise proper purpose for conducting an inspection by advancing a timeliness defense.

### 2. Evaluating Director Disinterestedness And Independence

The plaintiffs' other articulated purpose is straightforward. The plaintiffs seek to investigate issues of director disinterestedness and independence, which is a proper purpose.[28] The Delaware Supreme Court has observed that it is "within [a stockholder's] power to explore these matters." *Beam*, 845 A.2d at 1056. The Delaware Supreme Court has also criticized a plaintiff "who sought books and records to plead his complaint" because he "somehow only asked for records relating to the transaction he sought to redress and did not seek any books and records bearing on the independence of the board." *Sandys v. Pincus*, 152 A.3d 124, 128–29 (Del. 2016). This is a valid purpose.

### B. The Scope Of The Inspection

Because the plaintiffs have met the test for an inspection, this court must determine its scope. *Sec. First*, 687 A.2d at 569. The production of records in response to a Section 220 demand is not the equivalent of discovery in a plenary action. *Id.* The Section 220

---

[28] *See Rock Solid Gelt Ltd. v. SmartPill Corp.*, 2012 WL 4841602, at *4 (Del. Ch. Oct. 10, 2012); *La. Mun. Police Empls. Ret. Sys. v. Morgan Stanley & Co.*, 2011 WL 773316, at *7 (Del. Ch. Mar. 4, 2011); *Haywood v. AmBase Corp.*, 2005 WL 2130614, at *6 (Del. Ch. Aug. 22, 2005); *UICI*, 2005 WL 1377432, at *3; *Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 566 (Del. Ch. 1998).

plaintiff must establish "that each category of the books and records requested is essential and sufficient to [its] stated purpose." *Thomas & Betts*, 681 A.2d at 1035. "[T]he court must give the petitioner everything that is 'essential,' but stop at what is 'sufficient.'" *Palantir*, 203 A.3d at 752 (internal quotation marks omitted). At bottom, the plaintiff should receive "access to all of the documents in the corporation's possession, custody or control, that are necessary to satisfy [the plaintiff's] proper purpose." *Saito*, 806 A.2d at 114–15.

When tailoring the production order, the court must balance the interests of the stockholder and the corporation. *See Sec. First*, 687 A.2d at 569. When "a plaintiff has shown evidence of wide-ranging mismanagement or waste, a more wide-ranging inspection may be justified." *Freund*, 2003 WL 139766, at *5; *accord Skoglund*, 372 A.2d at 211. "[W]here a § 220 claim is based on alleged corporate wrongdoing, and assuming the allegation is meritorious, the stockholder should be given enough information to effectively address the problem, either through derivative litigation or through direct contact with the corporation's directors and/or stockholders." *Saito*, 806 A.2d at 114–15. "The source of the documents and the manner in which they were obtained by the corporation have little or no bearing on a stockholder's inspection rights. The issue is whether the documents are necessary and essential to satisfy the stockholder's proper purpose." *Id.* at 118.

The starting point (and often the ending point) for an adequate inspection will be board-level documents that formally evidence the directors' deliberations and decisions and comprise the materials that the directors formally received and considered (the "Formal

51

Board Materials").[29] A corporation should be able to collect and provide its Formal Board Materials promptly and with minimal burden. In many organizations, the corporate secretary maintains a central file for each board meeting in either paper or electronic form that contains the minutes and other Formal Board Materials for that meeting.[30]

---

[29] *See Cook v. Hewlett-Packard*, 2014 WL 311111, at *4 (Del. Ch. Jan. 30, 2014) (limiting inspection to "board-level" documents relating to an acquisition and subsequent problems with the acquired company); *Robotti & Co. v. Gulfport Energy Corp.*, 2007 WL 2019796, at *4 (Del. Ch. July 3, 2007) (permitting inspection of board minutes); *Grimes* 724 A.2d at 567 ("The right to obtain corporate records [to investigate demand refusal] focuses on the committee process itself and extends at least to reports or minutes, reflecting the corporate action," including "copies of the Special Committee's report, minutes of the meetings of the Special Committee and minutes of any meeting of the board of directors relating to the creation or functioning of the Special Committee, including any meeting of the board of directors at which the recommendation of the Special Committee was considered or approved" (internal quotation marks and footnote omitted)); *see also Axcelis*, 1 A.3d at 291 (observing that if a board declines to accept a director resignation under a system of majority voting with a board-rejectable resignation, then a stockholder can obtain through a Section 220 inspection "any documents and other records upon which the board relied").

[30] *See, e.g.*, 3 William B. Solomon & Michael A. Nemeroff, *Practice Checklist*, Successful Partnering Between Inside & Outside Counsel § 46A:31 (2015) ("In connection with the corporate secretary's role as the company's record keeper, the corporate secretary often maintains the official minutes of the meetings of the board in a central location. . . . The corporate secretary generally prepares board packages or gathers them from the applicable members of management, reviews what is gathered to ensure it is narrowly tailored to the board's purposes and disseminates the materials necessary for the board members to review in advance of each meeting of the board."); Soc'y of Corp. Sec'ys. & Gov'ce Prof'ls, Corporation Minutes: A Publication for the Corporate Secretary 23–24 (Feb. 2014) ("Corporate secretaries may also maintain separate meeting files for each board and committee meeting which includes the material related to the meeting and materials referenced in the minutes. . . . Companies have also started storing these materials electronically. . . .").

If the plaintiff makes a proper showing, an inspection may extend to informal materials that evidence the directors' deliberations, the information that they received, and the decisions they reached ("Informal Board Materials"). Informal Board Materials generally will include communications between directors and the corporation's officers and senior employees, such as information distributed to the directors outside of formal channels, in between formal meetings, or in connection with other types of board gatherings. Informal Board Materials also may include emails and other types of communication sent among the directors themselves, even if the directors used non-corporate accounts. *See Palantir*, 203 A.3d at 742, 753; *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 793 (Del. Ch. 2016), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019). In an appropriate case, an inspection may extend further to encompass communications and materials that were only shared among or reviewed by officers and employees ("Officer-Level Materials"). *See Wal-Mart*, 95 A.3d at 1273 (affirming order requiring production of Officer-Level Materials); *see also Beam*, 845 A.2d at 1056 (explaining that Officer-Level Materials can be necessary to understand how "directors handled [management] proposals or conduct in various contexts," which could reveal patterns of boardroom behavior).

### 1. The Types Of Documents Covered By The Demand

For each demanded category, the Demand seeks "Board Materials," which it defines as documents "that were provided at, considered at, discussed at, or prepared or disseminated, in draft or final form, in connection with, in anticipation of, or as a result of

any meeting of the Company's Board or any regular or specially created committee thereof." JX 50 at '011 n.57.

Through this definition, the Demand requests Formal Board Materials, Informal Board Materials, and Officer-Level Materials. The Demand seeks Formal Board Materials by requesting documents "provided at, considered at, discussed at, or . . . disseminated . . . in connection with, in anticipation of, or as a result of any meeting of the Company's Board or any regular or specially created committee thereof." The Demand seeks Informal Board Materials by requesting "documents prepared or disseminated, in draft or final form" and because the phrases "in connection with," "in anticipation of," and "as a result of" are broad enough to extend beyond documents formally reviewed during an official meeting. The Demand requests Officer-Level Materials because officers and other employees could have prepared documents in connection with, in anticipation of, or as a result of a board meeting.

Whether a stockholder is entitled to a particular category of documents "is fact specific and will necessarily depend on the context in which the shareholder's inspection demand arises." *Wal-Mart*, 95 A.3d at 1271 (internal quotation marks omitted). Because of the fact-specific nature of the inquiry, it will often be difficult to determine in the abstract whether a stockholder is entitled to more than Formal Board Materials. The analysis will generally need to proceed on a category-by-category basis.

In this case, an additional obstacle is the absence of information about what types of records AmerisourceBergen maintains and who has them. The plaintiffs sought this information in discovery, but AmerisourceBergen refused to provide it. JX 56 at '006. At trial, AmerisourceBergen relied on *Palantir*, which it interpreted as prohibiting a plaintiff

in a Section 220 proceeding from obtaining discovery into what types of books and records the company might have. *See* Tr. 118.

In *Palantir*, a corporation argued that a stockholder was not entitled to obtain emails using Section 220 unless the stockholder introduced "compelling evidence" that emails were necessary to fulfill a proper purpose. 203 A.3d at 754. In rejecting this standard, the high court held that the plaintiff had satisfied its burden by pointing to "some evidence" that production of the emails was necessary. *Id.* The high court explained that the plaintiff had made "as strong of a showing . . . as can be reasonably expected of a [plaintiff] in a summary § 220 proceeding." *Id*. The high court later noted that the plaintiff was "in no position to get discovery to determine how a company . . . conducts business and whether the books and records that address its needs come in the form of hardcopy documents, electronic PDFs, emails, or some other medium." *Id.* at 755.

Turning this pro-production reasoning on its head, AmerisourceBergen interprets *Palantir* as holding that stockholders are never entitled to obtain discovery into how a company maintains its books and records. *Palantir* does not say that, and to interpret the decision as establishing a bright-line rule would run contrary to Delaware's case-by-case approach to Section 220 proceedings.[31]

---

[31] *See Tiger*, 214 A.3d at 939 (rejecting presumption of confidentiality in Section 220 productions as inconsistent with the need to balance factors in an individual case); *United Techs. Corp. v. Treppel*, 109 A.3d 553, 558 (Del. 2014) (holding that because of the discretionary nature of Section 220 proceedings, "the determination of whether to impose a condition or limitation on an inspection [is] inherently case-by-case and fact specific" (internal quotation marks omitted)); *Espinoza v. Hewlett–Packard Co.*, 32 A.3d

55

It is often helpful when ruling on a Section 220 demand to have information about what types of books and records exist and who has them. The limitations on the scope of discovery in a Section 220 action exist to ensure that the parties do not expand a books-and-records action into a plenary proceeding, with the plaintiffs seeking discovery into the merits of future claims and the defendants seeking discovery into future defenses.[32] But the parties can obtain discovery into the limited issues raised by the Section 220 proceeding. *See* 2 Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 220.07[B], at 7-246 to -247 (6th ed. Supp. 2018-1). Just as a defendant can serve interrogatories or depose a plaintiff about its proper purpose, so too can a plaintiff serve interrogatories or notice a Rule 30(b)(6) deposition to understand what books and records exist and who has them. *See, e.g.*, *Wal-Mart*, 95 A.3d at 1269. The resulting record can

365, 372 (Del. 2011) (noting that on the related issue of the scope of an inspection, "[w]hether or not a particular document is essential to a given inspection purpose is fact specific and will necessarily depend on the context in which the shareholder's inspection demand arises").

[32] *See Palantir*, 203 A.3d at 754 ("Books and records actions are not supposed to be sprawling, oxymoronic lawsuits with extensive discovery."); *Chammas v. NavLink, Inc.*, 2015 WL 5121095, at \*1 (Del. Ch. Aug. 27, 2015) ("Extensive discovery can bog down a books and records action which is supposed to be handled on a summary schedule."); *Saito*, 806 A.2d at 114 ("[Section 220] does not open the door to the wide ranging discovery that would be available in support of litigation."). *See generally* Randall S. Thomas, *Improving Shareholder Monitoring and Corporate Management by Expanding Statutory Access to Information*, 38 Ariz. L. Rev. 331, 346–47 & n.88 (1996) (noting that Chancellor Seitz had added language to the draft version of § 220 in 1965 to "mak[e] it clear that this type of case should be given expedited treatment in the court system," and that the final version "created a summary procedure, *with expedited discovery on limited issues* and a quick trial" (emphasis added)).

assist the parties in resolving their dispute, and it later assists the court in crafting a tailored order.

In this case, AmerisourceBergen prevented the plaintiffs from obtaining any information about what types of books and records exist and who has them. As a result, the parties could not effectively meet and confer, and the court lacks a record on which to base a final order.

At present, the plaintiffs have shown that they are entitled to Formal Board Materials. After AmerisourceBergen produces Formal Board Materials, the plaintiffs may conduct a Rule 30(b)(6) deposition to determine what other types of books and records exist and who has them. If the parties cannot agree on a final production order at that point, then the plaintiffs may make a follow-on application for Informal Board Materials or Officer-Level Documents.

### 2. The Time Period Covered By The Inspection

The Demand seeks books and records dated "from May 1, 2010 to the present." JX 50 at '011 n.57. The plaintiffs proved that an inspection covering this time frame is appropriately tailored to the scope of the alleged wrongdoing. *See* Dkt. 44 at 52. The record at trial supports potential wrongdoing and mismanagement dating back at least to 2010. *See* JX 48 at '208, '210 (describing AmerisourceBergen's 2010 suspicious order reports for a customer that "exhibited several common indicators of suspicious activity for multiple years").

AmerisourceBergen argues that the inspection should not pre-date the time period covered by the statute of limitations. Dkt. 20 at 4. Just as its statute of limitations argument

fails to undermine the plaintiffs' proper purpose, so too it fails to constrain the scope of the inspection. The plaintiffs may be able to show that their claims are not time-barred, or they may use the information to support aspects of non-time-barred claims. They may also use earlier materials for purposes unrelated to litigation. *See supra* Part II.A.1.e.

### 3. Books And Records Concerning Opioid Distribution

The Demand seeks books and records concerning the following topics:

a.       the 2007 Settlement;

b.       the Bellco Acquisition;

c.       the Company's involvement and participation in the Pain Care Forum and the [Health Distribution Alliance];

d.       the Company's written policies regarding anti-diversion and compliance program, including, but not limited to, administration records through [its Diversion Control Program and Order Monitoring Program] and [its Corporate Security and Regulatory Affairs];

e.       the creation of a committee of the Board to review the Board's oversight of risks associated with the Company's role as a distributor of prescription opioid medications;

f.       the creation of the Governance and Nominating Committee;

g.       the decision to task the Governance and Nominating Committee with preparing a report with respect to the Board's oversight of risks associated with the Company's role as a distributor of prescription opioid medications;

h.       any materials supplied to the Governance and Nominating Committee for preparation of its report;

i.       any investigation or analysis of the Company's duty or obligation to conduct due diligence with respect to compliance with anti-diversion laws;

j.       lawsuits, investigations, or congressional inquiries relating to the Company's distribution of prescription opioid medications;

58

k.      the Company's anti-diversion and compliance programs, including, but not limited to:

(i) information concerning the origins of, causes of, or remedial steps taken in response to any deficiencies in the programs; and

(ii) any investigation, review, or analysis conducted by the company relating to any aspect of its anti-diversion and compliance programs, and any modifications made in response thereto.

JX 50 at '011–12.

AmerisourceBergen does not dispute that categories (d), (e), (i), (j), and (k) are subject to inspection, so those categories will be produced. AmerisourceBergen disputes whether categories (a), (b), (c), (f), (g), and (h) are subject to inspection. *See* Dkt. 20 at 46–51; Dkt. 37 at 25.

### a.     The 2007 Settlement And The Bellco Acquisition

Categories (a) and (b) address the 2007 settlement with the DEA and AmerisourceBergen's acquisition of Bellco. The plaintiffs argue that these categories relate to AmerisourceBergen's "existing positive obligations for compliance" and that the documents "are necessary and essential to determine whether the Board willfully disregarded the Company's obligations pursuant to the 2007 Settlement and Bellco Consent Judgment." Dkt. 44 at 48. Any production relating to these matters will be limited by the temporal scope of the Demand, which only seeks documents from May 1, 2010, to the present. As a practical matter, this means that the production would involve documents that were created no earlier than May 1, 2010, but that retrospectively summarize or analyze AmerisourceBergen's obligations or evaluate whether to make changes in how AmerisourceBergen complies with its obligations. The plaintiffs need these types of

materials because they suspect that AmerisourceBergen initially established a responsible standard of compliance after the 2007 incidents, but then backed away from compliance during the years after 2013. The plaintiffs are entitled to inspect these categories of books and records.

### b.    The Pain Care Forum And The Health Distribution Alliance

Category (c) addresses AmerisourceBergen's participation in trade associations including the Pain Care Forum and the Health Distribution Alliance. The plaintiffs contend that those documents "are necessary and essential to determine the extent to which the Board was alerted to the Company's involvement with these organizations which . . . were utilized for the nefarious purpose of skirting AmerisourceBergen's responsibilities under federal law." Dkt. 44 at 51. The plaintiffs seek these documents because of allegations in the Multidistrict Litigation that manufacturers and distributors collaborated through trade associations to increase opioid sales and ensure that DEA-imposed quotas remained artificially high. The plaintiffs are entitled to inspect this category of documents, which are necessary to investigate this aspect of the plaintiffs' concerns about wrongdoing.

### c.    Materials Involving The Governance Committee

Categories (f), (g), and (h) seek documents relating to the Governance and Nominating Committee (the "Governance Committee"). Category (e) seeks similar documents relating to an unidentified committee. The plaintiffs are only entitled to some of these materials.

Category (f) addresses the creation of the Governance Committee. The plaintiffs would be entitled to these materials, but AmerisourceBergen has represented that the

committee was formed in 2003. *See* Dkt. 20 at 50. The original records therefore fall outside the temporal scope of the inspection. The plaintiffs may obtain any later records from within the temporal scope of the inspection that discuss the formation of the Governance Committee.

Category (g) addresses a decision to task the Governance Committee with preparing a report on the oversight risks associated with opioid distribution. Category (h) seeks books and records supplied to the Governance Committee in connection with that report. The plaintiffs are entitled to these categories of books and records. One aspect of the plaintiffs' concerns involves how the directors have handled oversight risks. Any reports that the Governance Committee prepared and any documents that it received and reviewed regarding the distribution of opioids will show the extent to which AmerisourceBergen's directors and senior management knew about and addressed mismanagement or unlawful activity. It is possible that some of the documents may fall within other categories as well, but some degree of overlap is acceptable. The necessary-and-sufficient inquiry is concerned with the books and records themselves, not the framing of each individual category of requests.

Category (e) addresses "the creation of a committee of the Board to review the Board's oversight of risks associated with the Company's role as a distributor of prescription opioid medications." JX 50 at '011. AmerisourceBergen has represented that it never created such a committee. Dkt. 20 at 47 n.8. If they wish, the plaintiffs may test this representation in the Rule 30(b)(6) deposition. If there is no committee, then that is the end of the matter.

#### 4. Director Independence Questionnaires

The Demand seeks "[c]opies of the director independence questionnaires completed by each Board member during the prior four (4) years." JX 50 at '012. AmerisourceBergen concedes that these materials are subject to inspection. *See* Dkt. 20 at 46–47; Dkt. 37 at 25.

#### 5. Conditions On Production

AmerisourceBergen asks that any inspection ordered be subject to four conditions: (i) a mutually agreeable confidentiality agreement, (ii) a forum selection provision requiring any subsequent lawsuit to be filed in the Delaware Court of Chancery, (iii) agreement that all books and records would be incorporated by reference into any subsequent complaint, and (iv) the ability to redact non-responsive material. *See* Dkt. 37 at 53–54.

The plaintiffs do not object to conditions (i) or (ii), which are reasonable. The production will take place pursuant to a mutually agreeable confidentiality agreement that contains a forum selection provision requiring that any subsequent lawsuit based on the books and records be filed in the Delaware Court of Chancery. If this court would lack jurisdiction, then the lawsuit may be filed in a state or federal court located in the State of Delaware, or the plaintiffs may seek leave to modify the forum selection requirement. The incorporation-by-reference provision is also reasonable. *See Yahoo!*, 132 A.3d at 796.

The dispute over the right to redact is not something the court will address at this stage. Redactions should be limited, but they can be warranted. *See, e.g.*, *Plains*, 2017 WL 6016570, at *1. If there are disputes over redactions, then the court will resolve them. The same is true for any disputes over privilege.

### III.     CONCLUSION

AmerisourceBergen shall produce Formal Board Materials falling within the categories for which inspection is permitted. AmerisourceBergen also shall produce the director questionnaires that the Demand requested. Once the plaintiffs have reviewed these materials, they have leave to conduct a Rule 30(b)(6) deposition to explore what types of books and records exist and who has them. At that point, if the parties cannot agree on a final production order, then the plaintiffs may seek any additional Informal Board Materials or Officer-Level Documents that they can show are necessary for their inspection.